I'd like to reserve five minutes for rebuttal. First and foremost, I want to apologize for the court for the way my reply brief was structured. And by that I mean two things. First, the inclusion of my Italcon count four on the sufficiency of the evidence. I made a glaring error not raising that, in my opinion, and not raising that in my opening brief, and I apologize for that. In addition, when I included the claim in my brief, I did not include a statement of facts at the beginning of the reply brief. I only included it in the argument section. For that, I apologize. I urge the court, however, not to penalize my client for my errors. And despite my error, I do believe this Court still has discretion to address the claim. The error on my part is similar to the one that was made in U.S. v. Ullah, 976-5-509, where defense counsel failed to raise the issue of jury unanimity in his opening brief, but the court agreed to address the claim, even though he just raised it in his reply brief. I would submit that a claim of insufficiency of the evidence goes to the very foundation of due process and fairness. And here, Mr. Davis received a sentence of 240 months on count four. It was an error on my part to not raise the claim, and I would believe that it would be a manifest injustice to allow this count to stand. The facts surrounding count four are very straightforward. No one ever testified that Mr. Davis possessed a gun during the robbery of the First Federal Credit Union, which is count three. Thus, he could only be found guilty of violating Section 924C1 if he was found guilty under an aiding and abetting theory.  There are two other people who testified that Mr. Davis possessed a gun during the robbery of the First Federal Credit Union, Marcelle Swift and Andre Robinson. Andre Robinson testified that Jason Smith, Marcelle Swift, and D'Angelo Davis came to his house prior to the robbery. He also testified that their roles were discussed, however, he never got any specifics regarding who would do what. He also testified that the guns were brought by the participants who came to his house, however, he never specified who brought those guns. And he also said that they arrived in two separate vehicles, so it cannot be inferred that Mr. Davis brought that gun. Marcelle Swift also testified about what happened that morning. He, too, testified that they came to Andre Robinson's house in the morning to discuss the robbery. However, and I think this is the critical part, Marcelle Swift testified that Jason Smith brought a gun and he brought a gun. There was no testimony in the record that D'Angelo Davis brought a gun that morning. There's no testimony in the record that he encouraged anyone else to use a gun during that robbery. And no one ever testified that he encouraged them to use a gun during the robbery or after the robbery. That was the extent of the evidence on Count 4. Thus, I believe this case is indistinguishable from U.S. v. Nelson. In Nelson, just as in this case, there were multiple robberies. This Court found, however, that the defendant was guilty under an aiding and abetting theory on the first robbery, however, not for the second robbery, even though the defendant was present for the planning of both those robberies, just like the defendant here. In light of the facts in Nelson and the facts here, I don't think – I submit there's not sufficient evidence for Count 4. I urge this Court to address this claim and not penalize my client for my error. What would the effect be if we did agree with you? Well, if the Court did agree with me, 240 months would be taken off his sentence. His current sentence is 968 months. The sentence after that would be 728, I believe. That's a substantial amount of time. I tend to think in terms of years. How many years? Twenty years. I'm sorry. Twenty years. Twenty years would be taken off his sentence. He'd be down to 60 years instead of 80, roughly, is that right? Yes. How old is he? I believe at this point he's 35. So he'd get out at the age of 95? Well, with good time, he might actually – I think he would get out when he was 82. And while I realize that's a long time, I still think – Still, he'd be grateful for that. He would. And even if his sentence was 120 years, though, I still think the fact that there's not sufficient evidence to support the claim, I still think the Court should exercise its discretion to correct, to reverse the judgment. Aside from count four, however, this was a trial that was overrun with fear and intimidation. This atmosphere pervaded the courtroom, including the jury. Andre Robinson, who was one of the four cooperating witnesses to testify, testified that during his initial interviews with the government, he gave conflicting statements because he was afraid of Mr. Davis. This atmosphere of fear and intimidation was not limited solely to the witnesses. The same day that Andre Robinson testified, there was apparently an exchange between members of the gallery and a court security officer because the members of the gallery were trying to board an elevator that contained jurors. Apparently, there was an angry exchange, the court was informed, and the court was concerned enough that they admonished the gallery the next day, informing that there should be no contact with the jurors. The day after that – and it's not clear exactly when this happened, if it was the same day or if it was the next day – it was brought to the Court's attention that there had been an incident in the parking garage. One of the jurors, as they were trying to leave the building, felt that the people ahead of them were not leaving fast enough and appeared to take an interest in her, and she was concerned about it. The incident was witnessed by several jurors, and she discussed it with some jurors as well. Eventually, the court decided to hold a hearing to determine whether the jury had been intimidated. That hearing resulted in the dismissal of that juror, Juror 6, the one from the parking garage. And during that hearing, defense counsel specifically requested that the court inquire into the rest of the jurors whether they felt their attempts were being made to intimidate them, but the district court refused to do that. And I believe that that was an error on the district court's part that requires that this matter be remanded. And part of the reasons I feel that this claim is so strong is because as the trial went on, the theme of fear and intimidation continued. Eric Jukes, a witness the government never should have called, because he had given – well, Eric Jukes, a witness the government never should have called. Prior to his testimony, it became clear to everyone, based on my review of the record, that he was not going to testify consistently with his prior statements, meaning he was not going to impeach D'Angelo Davis. He was not going to name D'Angelo Davis as a participant in the U.S. bank robbery. He testified partially consistently, didn't he? What's that? He was partially consistent, was he not? Well, he was consistent in the sense that he said that four people had participated in the robbery. Correct. But he never named D'Angelo Davis as one of those participants. True. But he did. He did supply the evidence that there were four people involved in the robbery. Well, he did testify to that. But I think when you examine his testimony in whole, the true purpose and the true prejudice in his testimony was in the way that the questions were asked to him and the way that he phrased his answers. And specifically, he was asked numerous times if the reason his statement on direct was different from his prior statement naming D'Angelo Davis was because he was afraid of him. And the prosecutor, when he asked these questions, did not really say, were you afraid? He asked them in a tone and in a manner that told the jury that he was there, the prosecutor was present. Were you there for this examination? What's that? Were you there? No. How do you know what his tone was? What's that? How do you know what his tone was? Well, okay. Well, not the tone, but the phrasing. You said his tone. You just made that up. The phrasing. The phrasing of the questions. I misunderstood. Well, you really should correct yourself. Yes. Okay. I'm sorry. The phrasing of the questions was such that it informed the jury that he was present when Eric Chuks made a statement off tape, off videotape, saying that D'Angelo Davis was a participant in this U.S. bank robbery. And the prosecutor informed the jury that he witnessed these statements in the form of his question. And that was improper because he essentially becomes a witness propping up the statement that he's trying to impeach Mr. Chuks with. There was an agent who testified to that also, right? There was an agent who testified to that as well. And he was subject to cross-examination. Yes, he was. But I think the effect to the jury, it's still error. I mean, when you review the whole manner of Chuks' testimony, the theme of it is clear. The manner that those questions are phrased, he repeatedly asks, were you afraid of D'Angelo Davis? And it came through again and again and again. And in light of the other information that happened prior to that, it was perfect. What is the test? Is the test what was the basic primary purpose of the government in calling the witness? Judge Fernandez says there was at least a partial legitimate basis for calling him because he did testify to some relevant things. Is that enough? Or what standard do we apply if, assume for the moment, another purpose or a principal purpose was to put the witness on and then impeach him? Well, I think in order to attain relief, I would have to establish that that was the primary purpose,  I would have to establish that it was the primary purpose. And how do we determine whether it was the primary purpose? By looking at the comparative importance of the evidence? Yes. And I think when you read all of Chuks' testimony and the manner in which he was questioned, it wasn't just once that he asked him if he was afraid. It wasn't just once that he asked him if he had previously named D'Angelo Davis. What is wrong about asking whether he's afraid? Well, because there was no evidence in the – I mean, he was asking if he was afraid because he wasn't adhering to a statement that the government knew. I mean, isn't it part of the government's case to show this man as somebody you might be afraid of? Well, if they have evidence from Eric Chuks, admissible evidence that Eric Chuks was afraid of D'Angelo Davis, then I think they can ask him those questions, yes. Well, even – I don't – What was wrong with bringing that out? I don't get your point. Well, my point is – I thought your point was that he couldn't be called because – and questioned about this subject matter because the government's purpose was to impeach him. Yes, that is my point, yes. All right. And then – but you just said to Jeff Newman that it was okay to ask him about whether he was afraid. Is that consistent with what you're saying, that it wasn't all right to call him? No, I'm saying we could only ask him if he was afraid if there was admissible evidence from Eric Chuks that established that he was afraid. Well, and he answers it. Was there an objection to that, that he was afraid of the defendant? There was not an objection, no. Well, I mean, that was part of the government case. That was a perfectly legitimate question. I would disagree on it. Why? I don't understand why you're disagreeing that it would be a legitimate question if he had been properly called and if he was a proper witness to be asked these questions. I thought your objection was that they only called him in order to impeach him and that that was not proper and that they wanted to bring this out about fear, which they couldn't do because they were not allowed to call him to impeach him. Is that your theory? That is my theory, yes. All right. Yes. Very well put. Thank you. But they were allowed to call him in all events, were they not? They were allowed to call him. And they asked him a number of questions like the scene, how many people were there, et cetera, all of which were part of the case for sure. They were part of the case. I don't dispute that. Let me go back to your answer to Judge Fernandez. You said they were allowed to call him. If their primary purpose was to call him to impeach him, they were allowed to call him? Well, unfortunately, they called him as a witness. The defense counsel did not object until after he had already testified and asked that his testimony be stricken. Yes. So I'm trying to find out what your argument is. I had thought your argument was that they called this witness for the primary purpose of impeaching him. Yes. And that that was improper. Yes. That is my argument. Okay. All right. Then the questions they asked him are improper because he was an improper witness? Yes. Okay. All right. But how do we know what their purpose was except by looking at the questions they asked him? Well, I mean, I think based on looking at it, I think that's the main evidence that there is. I mean, there's not ---- And we've looked at some of those questions, and they're perfectly legitimate. So what were the ---- How do we know from the questions that the purpose was improper? That's your problem, to spell that out. The purpose was improper. How do we know it? Because ---- What's the evidence? The evidence was the manner in which the question ---- The manner. You weren't there for the manner. The phrasing. The phrasing. The phrasing was there. The phrasing of the questions was improper. All right. We'll study those phrases. The thrust of the government's examination of Eric Jukes was to impeach him. It was to ---- Eric Jukes denied that he was afraid of ---- Impeaching him by showing he was afraid? Eric Jukes denied on the stand that he was afraid of D'Angelo Davis. He denied on the stand that he ever made a statement during interviews with the government that he had ever named D'Angelo Davis as a participant in those robberies. The government then tried to impeach him based on those statements that he had made off the record. That was improper. And I ---- that seems ---- when you look at his testimony, that is the thrust of the government's questioning. I can see that they did ask other questions about ---- Did the government know before he testified that he was going to deny that Davis was the fourth person? Yes, he did. Okay. His attorney specifically stated when they ---- when they talked about what Jukes was going to testify to prior to his testimony, that he was not going to testify consistently with his prior statements, at which point he obtained immunity for his prior statements. It was improper for the government to ask him if he was afraid because they were using that based on impeachment statements or hearsay statements. And it was the same was true for his naming of D'Angelo Davis. You have about five minutes. Do you have any other issues you want to cover before you save time for rebuttal? Well, I do ---- maybe I'll leave three minutes for rebuttal because I do want to talk about the jury tampering. I think it was an abuse of the district court's discretion to not inquire into the jurors whether they felt that there had been attempts to intimidate them. The district court asked very generic questions. Do you feel that you'd be fair and impartial based on what's happened? That was not enough. I mean, this is a trial where Eric Jukes testified that he was afraid. I believe improperly. Martin Connors, another cooperating witness, changed his testimony on cross-examination, basically recanting everything. I mean, this whole trial was pervaded with a theme of fear and intimidation. The district court should have inquired into the jurors' minds whether they felt there had been attempts to intimidate them. And the court's failure to do that, I believe, was an abuse of discretion. And maybe I'll reserve four minutes for rebuttal if ---- Thank you, counsel. If it pleases the court, my name is William Wong from the Eastern District of California. I'm an assistant U.S. attorney. If the court will allow me, let me first address Mr. Jukes' testimony. Counsel stated that Mr. Jukes' attorney told the court that Mr. Jukes was going to testify inconsistent to his two previous statements. However, that's not quite clear. What Mr. Harrison said, and I'll read it verbatim, Mr. Harrison, I guess what has really caused this whole thing to occur, I guess, is that it's my understanding that my client may testify in a way that from his two previous statements, one in 1997 and another in 2000, that may be different from the way he testified in those prior statements. That's very ambiguous and very vague as to what he was referring to. Mr. Jukes was never allowed to speak to me. Mr. Jukes never made a statement as to what he was going to say. That's what the lawyer said to you, is that right? No, that's what the lawyer said to the court. Oh, the court. Nobody addressed you on that? Nobody addressed me on that, no. You were present when he addressed the court. Yes, that's correct. And didn't he say that he would testify differently and tell the truth, that there was no fourth person involved? No, he did not say that. It's not at page 1066 of the record? No, he testified. He said that, but he later changed it and said if he did, there was a fourth person involved. That's quite clear. In his testimony, he conflicted with himself. But I'm saying what was said before he testified. The lawyer said that he would testify that there was no fourth person involved. No, he did not say that. He did not. That's not my understanding. So all you knew at the point you called him was it would be a different way. Is that correct? We weren't sure which way he was going to testify. We didn't know which way he was going to testify. We had no idea what Mr. Jukes was going to say. We assumed that once he's under oath, that he's going to tell the truth. He asked for the immunity for the previous two statements that was given to him. We expected that he would testify truthfully. What I expected him to do was to testify as to his conduct, which he testified. He admitted that he lied during the first statement when he said there were only three people involved, when actually all he did was four. His testimony was very important because it corroborated Mr. Robinson. It corroborated Mr. Swift. He testified as to how they came into Sacramento driving a stolen vehicle and the other person driving a cold vehicle. He testified as to the respective roles of Robinson and Mr. Swift because initially in his first statement he said that Robinson went into the bank. Well, that was not true. Robinson testified he was driving the cold vehicle and that Mr. Swift and Mr. Davis went into the bank. Furthermore, Mr. Swift was consistent with Mr. Robinson. It was important for the government to corroborate the testimony of these two individuals, and Mr. Chutes did that. He came. He took the stand. He said, yes, there was a fourth person involved. I'm not going to name him, but he was six foot tall, slender, and I don't know his name. He also testified that, yes, I did tell a lie the first time. My role was not to drive the cold vehicle. I drove the hot vehicle. I drove the stolen van and that Mr. Robinson drove the cold vehicle and that Mr. Swift and this fourth person went into the bank. Now, that's all consistent with what Mr. Swift and Mr. Robinson testified to. That's why his testimony was very important. Now, was that description of the fourth person an accurate description of Davis? No. Mr. Davis was five feet eight, very stocky, and the cameras captured that, and I cross-examined him about that. I said, look, the cameras captured the second person as five foot eight, stocky. The person you described as the fourth person, six foot and slender, does not match that, and he could not answer that. He just simply spoke. You break them up on that. Exactly. Exactly. Furthermore, Your Honor, counsel said that this particular trial was charged with, I believe, indicated fear and intimidation. That's entirely correct. Mr. Davis' friends and supporters were there every day, and this, if you read the transcript, you get a pretty good flavor. Everyone was intimidated by the presence of 40 or 50 individuals dressed the way they were and when they came to court. How were they dressed? In black. It's reminiscent of back in the 70s and 60s when the Black Panthers would come in. It was very highly charged. It was like going to a Raiders game. Say again? Like going to a Raiders game. Sort of, Your Honor. Only without the umpire, except for the judge. It was something that the defendant created. It was an atmosphere that his supporters created throughout the trial, and now he's attempting to take advantage of that. Going back to counsel's statement regarding vouching, the court is aware that the defendant is relying heavily on the Edwards case, and I want to draw some distinctions between Edwards and this case. In Edwards, first of all, the standard review. In Edwards, Edwards made a timely objection, therefore, harmless error standard applied. Here, Davis made no objection, therefore, plain error applies. The factual distinction in Edwards is that the prosecutor in that case was an individual who found the critical piece of evidence inside the bag that connected the defendant to the bag. That was the only linkage other than some type of questionable hearsay statement by an individual named Grimes. In Davis, Special Agent Wilson was available to be cross-examined. He testified as to not what the prosecutor said, but what Chukes stated, and that's a big distinction there. It's what Chukes stated during those prior two statements, not what the prosecutor did. Furthermore, Mr. Elliman, who was Chukes's counsel at that time, was also available, and if you read the transcript, Elliman's attorney stated many times that Elliman did not want to testify because he was feared, he was intimidated, he was concerned for the safety of his children and his family if he was to testify. But what's the purpose of the prosecutor saying, didn't you say X to me, didn't you say Y to me, wasn't I there when you said A, B, C? Since obviously the prosecutor is not going to take the stand if he denies it, I presume the prosecutor is not going to take the stand and testify that he did say those things to and in the presence of the prosecutor. If I can understand asking an agent about it being in his presence, et cetera, et cetera, but what's the exact point of injecting the prosecutor into it? Well, looking back, Your Honor, it probably was not the most articulate, most careful thing that could have been said, and I agree with the Court on that. But the fact remains that the prosecutor was present at that meeting. That's a matter of fact. Do you also agree it wasn't proper to say to the jury, I'm here to talk to you about the interests of the people, those of us who go to work every day, go to work every single day, earn what we get to put in those hard hours, life, liberty, freedom, nothing unless we can be assured in our society that we can go about our business without being threatened and intimidated, et cetera? Is it proper for the prosecutor to say we, you and I, to the jury? Is that what we means, you and I, the jury and the prosecutor? It means the entire community, Your Honor, and I agree with the Court perhaps that could have been toned down, but I don't believe that that one statement in the midst of a one-month trial would be another public transgression. Fine with a highly unnecessary reference to September 11th, right? Well, that was just in passing, Your Honor. If you take a look at that reference in context, it simply says since September 11th, we are now more concerned with aspects of what's important, the values in our country. That's all it was. Those values weren't important before September 11th? No, but sometimes events that occur remind us of the importance of the principles on which we were. And the jury had to be reminded about September 11th in order to convict a criminal defendant? No, Your Honor. And if I could, Your Honor, let me ask you defense counsel's failure to bring up the issue of the count four. Count four, yeah. Yeah. I think it's. Go ahead. I believe it is highly inappropriate. It puts the government at a very severe disadvantage. This is not a case. Well, we could put you back at the advantage. You're worried about the fact you didn't have a chance to brief the issue? That's correct, Your Honor. Well, we could give you a chance to brief it if that's. . . That would be fine, Your Honor. That would be fine? That would be fine. Okay. Is there anything else I can address, Your Honor? One thing if I may, Your Honor. The court regarding the jury tampering issue, the court did go out of its way to call each juror back and ask them questions regarding what they saw outside of the courtroom and whether or not that affected them, and I want to just touch on that just briefly. The question the court asked can be found on page 741. Is there anything that you observed outside this courtroom or heard outside the courtroom that would affect your judgment in this case as a juror? I believe that question covers what counsel at the time requested the court to do. They wanted to find whether or not these jurors were intimidated by this garage incident and the elevator incident. I think that question is a general question that's directed to what they saw or heard that could affect their impartiality because if the court was concerned about asking a more direct question, because of these incidents you should have been intimidated. That was not the road the court wanted to take there, and I think that the law allows the discretion to the district judge to structure the questions in a manner that can preserve the impartiality of the jury, and for that reason I believe that that particular issue should not cause any reversal in this case. Any other? I wanted to sort of pin down, when was the objection made to Chooks' testimony? You examined them, and then what happened? I don't believe there ever was an objection to that, Your Honor. There wasn't? No. So it's only in the briefs? To Chooks' testimony? There was no objection to Chooks being called? Oh, to Chooks being called? Yes. No, there was not an objection raised by defendants, counsel. What it was was Chooks' attorney, Mr. Harrison, came to court and raised the issue of whether or not he is entitled to assert a Fifth Amendment. It wasn't a question of objecting to his testimony. It was whether or not he would be granted immunity. I see. But defense counsel didn't raise it at all. Did not raise it at all. Did he cross-examine Chooks? Yes, and he got out of Chooks the fact that this fourth person is not Mr. Davis. He went to town on that issue. He brought out the fact. He asked Mr. Chooks. He went along with the whole thing. Exactly. All right. Thank you. Anything else? On the fourth count, would you per ---- we'll let you know whether we want briefing on that issue, but would you prefer to delay until a brief, if there is a brief, any comment on it? What is it? Do you have a comment you'd prefer to offer now? Whatever the Court prefers, Your Honor. It's up to you. I mean, you're right that it was raised in the reply, and if we were to consider the issue, you'd have a right to find a file a reply brief or file a brief. But if you'd like the opportunity to comment on it now, you certainly may. I'd be more than happy to comment on it. I think this case can be distinguished from the cases cited by counsel in this respect. The first robbery was the Golden One robbery. In that particular case, the evidence is clear that Mr. Davis and Mr. Swift brought guns to Mr. Robinson's apartment. There they disseminated the tools of the robbery trade, the masks, the guns, what have you. In the second robbery, Mr. Robinson's back was turned. People brought the gun. He couldn't identify which one brought the gun. In the third robbery, Mr. Davis used the gun himself. In the fourth robbery, Mr. Davis again used the gun himself. In the fifth robbery, he did the same thing. So the count four is actually the second of the five robberies in sequence. Mr. Davis clearly intended to assist and aid and vet the others to use the gun for the purpose of committing the robbery. He drove them over there. He scoped out the place prior to the robbery. They intended to use the gun. He knew they were going to use the gun, and he intended to aid and vet that use of the firearm by driving them over there and then picking them up after the robbery had occurred. That's just a brief factual summation. I would like an opportunity to brief that issue, Your Honor. All right. Thank you. I'd like to go back to the Chooks argument. First, on page 1064 of the record, Chooks' attorney, Mr. Harrison, had stated that Chooks was concerned about testifying because he felt he would incur criminal liability if he testified differently from his prior statements to the government.  The District Court, yes, the attorney is stating to the Court, the Court, the District Court was trying to get exactly what was going to happen, and point blank he asked the attorney what he felt, what his position was of what Chooks was going to say. And on page 1064 of the record, Mr. Harrison said the liability is that his testimony today will be different than his previous testimony, and by the testimony he meant his previous statements. In light of that, in light of the fact that Chooks was granted immunity for his prior statements, I don't know how anyone could claim they believed he was going to get up there and adhere to those statements on direct testimony. There's no objection by defense. There's no objection until after Chooks' testimony is done, the defense moves for a mistrial based on Chooks' testimony, claiming that the government had called him for the sole. After they had cross-examined him? Yes. Yes. So they went ahead with Chooks as a witness. They got the evidence they wanted on cross-examination. Yes. I mean, it was the objection was not raised until cross-examination was done. And I'm not entirely sure, but it seems to me that the attorney was unclear about whether this was actually a claim, based on my review of the colleague that he had with the Court. That being said, going back to the – to Troy Ellermann, when the government was trying to impeach Chooks by calling other witnesses, by calling the agent, Mr. Ellermann testified that he – who was Mr. Chooks' prior attorney, testified that he did not want to be called as a witness. However, I do not believe it was because he was afraid. When you read the transcript, it seems clear to me that he did not want to be in the position of a defense attorney being forced to testify against his former client. He felt that that would be bad for his reputation. And I think that it's important to note something that the AUSA said when he was up here speaking to Your Honors. He agreed that this trial was pervaded with the theme of fear and intimidation. I think that dovetails right in to whether the district court abused its discretion to count four and not conducting a more thorough hearing and examining the jurors. You know, the basic questions of do you feel you can be fair and impartial is not enough, especially in this case where you had two incidences of jury tampering, I believe, the one on the elevator as well as in the parking garage. I understand. There wasn't any tampering on the elevator. These guys wanted to get on the elevator, and they said, no, you can't. Well, but apparently there was an error. How does that make up jury tampering? Well, because the Court describes it as an angry exchange between a court security officer and one of the gallery members. Yes. In light of the fact that we now know that multiple people were coming into the gallery with the same color clothing, I mean, they had been instructed, the gallery had been instructed not to confront the jurors. I mean, most of us, when we get an order from a law enforcement official, obey that order. If someone challenges an official, I mean, there would only be one reason in my mind why they would challenge that, to try to send a message to somebody else. And the only people on this elevator besides the court security officer were the jurors. And then we have the incident in the parking garage. And Juror 6 was a juror who was dismissed. But Juror 2 also said, when she was questioned by the district court, that there had been a general sense of discomfort among the jurors. In light of that record, I believe the district court had an obligation to ask whether they felt there had been attempts to intimidate the jury. And that was not done in this case. And I think that that the matter needs to be remanded back to the district court for an evidentiary hearing on that issue. Thank you. Thank you, counsel. The case just argued will be submitted. We will now take the cases separately of United States v. Nakai and United States v. Orsinger. We'll have separate arguments in those cases. Thank you. Thank you. Which is the 10-minute one? What? Do you remember which was the 10-minute one? Yeah. Just one minute, counsel. Is Orsinger the 10-minute argument? Yes. Then we'll hear Orsinger first, I guess. May I proceed?
judges: Reinhardt, Noonan, Fernandez